UNITED STATES of America,
Plaintiff,

v.

UNITED TECHNOLOGIES
CORPORATION,
Defendant.

Case No. 3:99-cv-093

United States District Court,
S.D. Ohio, Western Division,
at Dayton.

Signed June 3, 2016

Alan S. Gale, Dennis L. Phillips, U.S. Department of Justice, Michael F. Hertz, Stephen D. Altman, Department of Justice, Washington, DC, Dale Ann Goldberg, Pamela M. Stanek, Dayton, OH, for Plaintiff.

Brian C. Elmer, David Z. Bodenheimer, Peter B. Work, Richard L. Beizer, Crowell & Moring, Washington, DC, David Carr Greer, James H. Greer, Dayton, OH, Fred H. Bartlit, Hamilton H. Hill, Jeffrey A. Hall, Michael J. Valaik, Chicago, IL, for Defendant.

**ENTRY AND ORDER GRANTING-IN-PART UNITED TECHNOLOGIES CORPORATION'S MOTION FOR ENTRY OF FINAL JUDGMENT, DOC. 457, AND DENYING-IN-PART THE UNITED STATES' CROSS–MOTION FOR ENTRY OF FINAL JUDGMENT. DOC. 464.**

THOMAS M. ROSE, UNITED STATES DISTRICT JUDGE

Pending before the Court are Defendant United Technologies Corporation's Motion for Entry of Final Judgment, Doc. 457, and Plaintiff United States' Cross–Motion for Entry of Final Judgment. Doc. 464. The case is currently before the Court on a second remand from the United States Court of Appeals for the Sixth Circuit.

## I. INTRODUCTION

The United States brought an action against United Technologies Corporation's predecessor, Pratt & Whitney ("Pratt"), asserting claims for alleged violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)&(2), and for relief under the common law theories of breach of contract, payment by mistake, and unjust enrichment. A bench trial proved United Technologies' assertion of a statute of limitations defense inapplicable and proved United Technologies liable on the United States' claims arising under the False Claims Act. This Court found the United States' common law claims barred by claim preclusion. *United States v. United Techs. Corp.*, 2008 WL 3007997, at *11 (S.D.Ohio Aug. 1, 2008), aff'd in part, rev'd in part, 626 F.3d 313 (6th Cir.2010), as amended (Jan. 24, 2011).

In its findings of fact, the Court noted that Pratt's false statements caused a false claim to be paid during the first year of the contract, "FEC I," but that FEC I, was not part of the Government's False Claims Act charge. *Id.*, at *11. The Court further noted that the Government suffered substantial damage over the course of FEC I. *Id.*, at *12.

Most particularly, the Court found that Pratt fraudulently asserted that its ceiling price quotes were decremented in Pratt's Best and Final Offer ("BAFO") Exhibit 3.8.1 on all sole-sourced vendors in an amount within the range established by

Pratt's Procurement Cost Accounting Group ("PCAG") recommendations for each supplier and Pratt's past experience in achieving PCAG recommendations. The Court also found that Pratt fraudulently asserted that the prices it submitted were substantiated by the most recent data, and fraudulently asserted that it applied the predicted domestic rate of inflation. While the Court found a False Claims Act violation, the Court also found that the Government suffered no actual damages in the years under review (FEC III–FEC VI), primarily due to price reductions in some years of the contract, including crediting an Air Force negotiating officer's statement that a switch from full warranties to capped warranties made no difference, reducing the amount of damage suffered in other years, and that prior litigation before the Armed Services Board of Contract Appeals precluded the Government from pursuing common law claims. *Id.* This opinion awarded $7,090,000 in statutory penalties to the government. Both parties appealed this Court's decision.

The United States Court of Appeals for the Sixth Circuit affirmed the finding of fraud and the statute of limitations ruling, but found that the government's common law claims were not precluded by prior litigation before the Armed Services Board of Contract Appeals. The Sixth Circuit affirmed the liability determination, reversed the damages calculation, and remanded for a determination of liability on the common law claims and a recalculation of damages. *United States v. United Techs. Corp.*, 626 F.3d 313, 325 (6th Cir.2010), as amended (Jan. 24, 2011). The Sixth Circuit particularly disagreed with this Court's valuation of warranties, disallowed year-to-year offsets to damages and ordered that the fair market value of the engines the Air Force received be accounted for when determining damages.

On remand this Court found United Technologies liable on the United States' claims for payment by mistake and unjust enrichment. The Court concluded that Pratt's BAFO prices plus 15% profit during FEC III, IV, V and VI represented the fair market value of the fighter jet engine contract, that the warranties generated zero off-set as they were worth the price negotiated, and that the government was thus entitled to damages totaling $657 million. *United States v. United Techs. Corp.*, 950 F.Supp.2d 949, 955 (S.D.Ohio 2013), rev'd, 782 F.3d 718 (6th Cir.2015). United Technologies appealed.

The second appeal concerned whether issue preclusion barred the government from obtaining additional damages under the False Claims Act and common law restitution given an Armed Services Board of Contract Appeals finding about the role of competition in determining the prices the government paid for the jet engines and whether, even if issue preclusion did not apply, the district court's $657 million damages award was supported by the evidence. *United States v. United Techs. Corp.*, 782 F.3d 718, 721 (6th Cir.2015). First, the Court of Appeals affirmed the determination that issue preclusion does not bar the government's damages claims under the False Claims Act and common law restitution. *Id.* at 729–30. Next, it rejected the unclothed conclusion that GE engines were not a comparable price comparison due to costs related to beginning production of an engine it had never produced based on the "assertion [that] GE Aircraft's market entry costs at any rate may reveal less than one might expect, [as] GE Aircraft Engines was not a start-up making a debut in constructing jet engines, but rather had been producing engines (albeit different models) for years" *Id.* at 735. It concluded that the comparable sales valuation method should have been applied; and the district court had to

decide in the first instance on second remand whether the government should have another opportunity to prove that it suffered damages. *Id.*

Now, United Technologies has moved the Court for entry of final judgment reflecting the $7,090,000 penalty, arguing that the Court should not reopen the record to allow the government to further attempt to prove damages. Doc. 458. The government somewhat agrees, agreeing that it is entitled to $7,090,000 in statutory damages, but instead of requesting that the Court reopen the record, urges the Court to allow it to seek disgorgement of wrongful profits from FEC I, the first year of the contract, an amount of damages the government asserts would total $85,565,572, representing disgorgement of unjust enrichment of $23,762,721, prejudgment interest through August 31, 2015 on that proposed award of $54,712,851, and the previously awarded False Claim Act penalties of $7,090,000 for contracts in later years. United Technologies responds that profit disgorgement is barred by the mandate rule, that the government waived profit disgorgement, and that disgorgement fails on the record. The Court will consider United Technologies' positions in order.

## A. Barred by the Mandate Rule

■■■ "[R]emands . . . can be either general or limited in scope. Limited remands explicitly outline the issues to be addressed by the District Court and create a narrow framework within which the District Court must operate. . . . General remands, in contrast, give the District Court authority to address all matters as long as remaining consistent with the remand." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir.1999). In the absence of express language in the mandate itself delimiting the precise issues to be considered on

remand, the mandate is presumed to be a general mandate. *United States v. Moore*, 131 F.3d 595, 598 (6th Cir.1997). In this case, the mandate language used by the Sixth Circuit contains no explicit limitations on the issues that this Court may consider on remand.

United Technologies claims the Sixth Circuit "forcefully indicated that the case should end now" Doc. 458 at 9, PageID# 38966, citing to text of the opinion that states, "there is something to be said for leaving it at that." 782 F.3d at 735–36. Putting aside the forcefulness of this statement, United Technologies' position ignores the implications of other statements, such as, "(putting aside the disgorgement of profits, which the government does not seek here,)" *Id.*, at 731, that intimate disgorgement of profits could still be brought into play.

However, the Sixth Circuit stated its remand as follows: "For these reasons, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion." *Id.*, at 736. This is the quintessential general mandate and this Court is thus free to consider any matter not previously decided so long as this Court does not act inconsistently with the Sixth Circuit's decision.

## B. Waiver of Profit Disgorgement

■■■ United Technologies also argues that the government waived the disgorgement remedy, invoking the doctrine of election of remedies. See Doc. 465 at 4-6. United Technologies points out that the government stated in an earlier brief on damages that:

> Under the law of unjust enrichment, the government could have sought a remedy based not on the government's damages but on UTC's profits. Had it elected to do [that], the government estimates that its recovery, including prejudgment in-

terest, could have been in excess of $1.6 billion. Instead, the government has sought compensation only for the damage that UTC's massive fraud inflicted on the government . . . .

ECF No. 427 at 19-20. According to United Technologies, this is an explicit statement confirming that the government abandoned a profit disgorgement remedy. Doc. 465 at 4-6 (citing *Innovation Ventures, LLC v. NVE, Inc.*, 90 F.Supp.3d 703, 731, 734 (E.D.Mich.2015) (granting motion *in limine* ) and *Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 862 n. 5 (9th Cir.1987)(noting express waiver of an issue on appeal).

 Election of remedies, however, is a disfavored doctrine under federal law and any attempted election of one of two alternative remedies is not effective unless and until the plaintiff actually obtains the remedy it elected:

> A fruitless attempt to recover on an unavailing remedy does not constitute an election which will deprive a person of rights which are availing by a different and appropriate remedy; the remedy must at least be to some extent efficacious in order to constitute an election. If no remedy is obtained, the election is no election at all and the plaintiff may seek the alternative remedy.

*Estate Counseling Services, Inc. v. Merrill Lynch Pierce Fenner & Smith*, 303 F.2d 527, 530–31 (10th Cir.1962) citing *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 490–91, 39 S.Ct. 533, 63 L.Ed. 1099 (1919) ("[T]here is no basis for the claim of estoppel by election; nor any reason why the [plaintiffs], who failed in the attempt to recover on one theory because unsupported by the facts, should not be permitted to recover on another for which the facts afford ample basis."). See also *Medcom v. Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 228–29 (7th Cir.

1993), *Abdallah v. Abdallah*, 359 F.2d 170, 174–75 (3rd Cir.1966). The government's prior election of its damages remedy did not waive the right to seek an alternative remedy of disgorgement if the elected remedy failed.

## C. Record Support of Disgorgement Shown on the Record

 United Technologies claims disgorgement fails on the record. According to United Technologies, the government's proposed disgorgement of profits is again based on government expert witness Dannie Zacheretti's calculations, which United Technologies asserts, the reviewing court has already rejected. United Technologies also asserts that FEC I engine price reductions offset nearly all of the BAFO price inflation calculated by Zacheretti, and, United Technologies further asserts, substantial detriment is essential to the government's unjust enrichment claim. Finally, United Technologies resurrects arguments that the parties' express contract bars the unjust enrichment claim and that the government is not entitled to prejudgment interest.

 "Both restitution and disgorgement are remedies designed at preventing the unjust enrichment of a party who has committed a wrong, and not at ensuring a wronged party is made whole. This is the essence of equity jurisprudence, and these remedies are . . . inherently equitable." *F.T.C. v. Mazzoni & Son, Inc.*, 2007 WL 2413086, at *3 (E.D.Mich. Aug. 14, 2007). "[D]isgorgement of improper profits" is a restitutionary remedy, *Chauffeurs, Teamsters, and Helpers, Local Number 391 v. Terry*, 494 U.S. 558, 570-71, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), and "restitution is appropriate only where there has been a showing of unjust enrichment." *U.S. ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *3 (S.D.N.Y. Nov. 4, 2005). The remedial pur-

poses of damages and of restitution and disgorgement differ. *U.S. ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *4 (S.D.N.Y. Nov. 4, 2005). "Damages typically focus on the plaintiff and provide make–whole, compensatory, monetary relief; restitution, by contrast, concentrates on the defendant– preventing unjust enrichment, disgorging wrongfully held gains, and restoring them to the plaintiff." *Id.* "Restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss. Dobbs, *Law of Remedies*, at 555 (2d ed. 1993); See also *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 482 (6th Cir.2001). The amount of money subject to disgorgement in a given case is measured by "the entire amount of profits which were illicitly received" as a result of the defendant's wrongdoing. *S.E.C. v. Great Lakes Equities Co.*, 775 F.Supp. 211, 214 (E.D.Mich. 1991). In effect, the government is attempting to circumvent the Sixth Circuit's determination that "the district court should calculate what the government eventually paid each year…, what it should have paid each year based on what the government received, then take the difference between the two." 782 F.3d at 730 (quoting 626 F.3d at 322).

 All doubts concerning the amount of disgorgement must be resolved against the wrongdoer. *S.E.C. v. Hedge-Lender LLC*, 786 F.Supp.2d 1365, 1370 (S.D.Ohio 2011). A party seeking disgorgement is not required "to produce data to measure the precise amount of the ill-gotten gains," but rather need merely show that the amount of disgorgement it requests is a "reasonable approximation of the profits causally connected to the violation." *Id.*

In each year subsequent to FEC I, the Air Force issued "calls for improvements," an exercise that allowed Pratt and GE to lower prices in an attempt to obtain a larger share of the Air Force's business. Pratt made substantial decreases to its best and final offer prices. Pratt's combined engine and warranty price discounts were $101 million for 1986 alone. See *United Techs.*, 2008 WL 3007997, at *8. Pratt even applied some discounts retroactively to first year prices. 782 F.3d at 732 (citing ASBCA I, 04–1 BCA at 161,014–15). These decreases do not account for other terms of the offers, including reduced warranty coverage in some years. *Id.*

The FY85, FEC I, engine unit price was originally $2,887,710. DX 291, p. 4, CLIN 0005AA; Tr. 2727 (Rhodeback). After the first remand, this Court "determine[d] that in FEC I the government eventually paid $423,416,265, of which $23,762,721 was attributable to fraud, meaning that the fair market value the government should have paid was $399,653,544 in FEC I." 950 F.Supp.2d at 955 (rejecting the same offsets argument. Doc #: 428 at 8 PA-GEID# 32352).

In October 1984, Congress passed the Defense Department Authorization Act for FY85, which prohibited the Air Force from making a contract to purchase engines if the warranty price exceeded 10 percent of the total contract price. See Pub. L. No. 98–525, 98 Stat. 2591 (1984). After this, the Air Force accepted a warranty modification and incorporated it into the contract. The first finding of fact observed, "Even in FEC I, Pratt responded to the Air Force Call for Improvement by reducing the engine warranty price from more than $1,000,000 to about $140,000 per engine." 2008 WL 3007997, at *7, Doc. 397 Pa-geID# 30907. "Pratt had improved the warranty price by $50.1 million in FEC I"

*Id.*, at \*8, PageID# 30908.[1] The Air Force exercised its option under these revised terms and awarded 40 engines to Pratt and 120 engines to GE for FEC I. 626 F.3d at 317.

Now, United Technologies asserts that reductions made in later years offset damages suffered in FEC I because the later-year price reductions were denominated "retroactive." United Technologies estimates that three retroactive engine-price discounts provided another $22.5 million in savings that are not reflected in the figures listed above. See Doc. 428 at PageID# 32352-53. It is these changes which United Technologies focuses on now. United Technologies emphasizes that the Air Force never paid the original FEC I engine price, because of three engine price reductions in the following years.

The first of United Technologies' three reductions were during FEC II, which is to say, "during the FY86 competition," doc. 219 at 35, PageID# 3604, while competing for engines in FEC II, Pratt made a "Retroactive Price Reduction (12/3/84)." During the FY86 Call for Improvement, Pratt deleted a price term limiting Foreign Military Sales of engines, giving the Air Force a "retroactive" FY85 engine price reduction. DX 309, 004480; Tr. 1384-85 (Hansman); Tr. 2716–18 (Rhodeback). While one might conceptualize the original sale as having been made, and, consistent with this, credit all savings realized from the Foreign Military Sales against the Foreign Military Sales themselves, crediting this against the original contract would

cut the engine unit price to $2,816,485. DX 294, p. 4, CLIN 0005AA.

The second reduction came while Pratt was competing for what became known as the Air Force Eglin Engine Buy, Pratt again lowered a contractual provision. On September 12, 1985, the Air Force decided to buy new Pratt engines for the Eglin fighter wing to avoid a mix of new and old engines. DX 299, p. 2. During these negotiations, Pratt deleted a price term limiting additional Air Force engines to 15% of the original contract buy. Tr. 2734 (Rhodeback). If this change were credited against the FY85 unit price for all of the FEC I engines, and not just the Elgin Air Base engines, it would reduce it to $2,710,033, as it would result in additional per engine savings of $106,000 per engine. DX 301, p. 001470, CLIN 005AA; Tr. 2734-35 (Rhodeback).

Finally, UTC would have the Court credit concessions achieved competing for Korean military sales against all of FEC I. The Koreans held a competition, choosing Pratt's engines over GE's. DX 303. On December 31, 1985, Pratt revised another price term ("lead time was significantly shorter than required via contract"), thus allowing the Air Force "to lower the prices of all [FY85] engines." Id.; see also DX 304, p. 001518 (engines "bought via P00009 does exceed the [variation in quantity] option clause . . . ."). This change reduced the foreign military sales engine unit prices for FY85 from an original contract price of $2,887,710 to $2,785,372. DX 305, p. 5, CLIN 0060AB.

---

1. The government argues that the Court should place the burden of proof of the reduced engine prices on United Technologies. Doc #: 464 at 9, PageID# 28991 (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 51(5) (2011)). Similarly, the government argues this Court should place the burden of proof of the value of the reduced warranties in year one on United Tech-

nologies. *Id.* at 10. Both of these positions may be correct. Indeed, the Sixth Circuit has already ruled that this Court may not accept the value of the warranties as having been determined in an arm's length negotiation, unburdened by any BAFO regulations. Initially, however, the government must prove amounts it received.

United Technologies asserts these three separate contract changes, which occurred 12 to 24 months after the 1983 BAFO, deleted three separate price terms, and resulted in the Air Force "never paying" the original contract engine unit price of $2,887,710. While 40 engines were originally negotiated at $2,887,710 each, eventually 90 Air Force engines were sold in FY85, the reduction from the original contract engine unit price ($2,887,710) to new price ($2,710,033) totaled $15,990,930. For the 69.445 Foreign Military Sales engines (less five free engines to Korea), the original contract engine unit price ($2,887,710) minus the reduced price ($2,785,372) yielded an overall reduction of $6,595,172. See DX 303, p. 001515 (final FY85 engine prices and quantities). Together, United Technologies asserts, these retroactive FY85 price reductions saved the Air Force over $22.5 million. See Doc. 428, at 4-5.

Arguably, the Sixth Circuit has already foreclosed United Technologies' approach. In the original finding of facts this "court found that the government suffered no damages because Pratt's price reductions offset any cost overstatements in its final offer." 626 F.3d at 319. In determining False Claims Act liability, the Sixth Circuit rejected this approach: "In soliciting revisions, moreover, the Air Force indicated it would consider each revision on a 'stand alone basis,' not that it would reconsider the entire program." 626 F.3d at 320.

▋ In the context of damages, instructions were given that "The district court should calculate the difference between what the government paid each year . . . and what it should have paid each year. It should not subtract the price reductions the government won for [later years] when it determines whether the government suffered any damages . . . ." 626 F.3d at 322. Under the False Claims Act, retroactive off-sets achieved later in time but credited to a contract year are allowed, but savings achieved in later years may not off set damages in other years. United Technologies would have the same rules apply to disgorgement of profits.

In effect, United Technologies would have the court believe a car dealer offering to take over a car loan payments on a trade-in when offering to sell a new car was really making a free-standing offer to lower the price negotiated on the old car. No. If a person bought a car for $30,000 three years ago, and today, still owing $5,000, wants to buy a car with a sticker price of $40,000 and the salesman said, "on top of what I'm offering for your trade-in, I'll pay off the balance of your loan on it." One would think the new car buyer would conceive of himself as having negotiated another $5,000 off the price of the *new* car, not that he would boast of having only paid $25,000 for the old car, as he "never paid" the negotiated price of $25,000. Account for it however you like, common sense says what is being negotiated are the terms of the new car, especially as in neither case, the car or the jet engine, would the reduction of the balance due on the original sale occur without the subsequent sale.

After the first remand, this Court "determine[d] that in FEC I the government eventually paid $423,416,265, of which $23,762,721 was attributable to fraud, meaning that the fair market value the government should have paid was $399,653,544 in FEC I." 950 F.Supp.2d at 955 (rejecting UTC's exact same offsets argument. See Doc #: 428 at 8 PageID # 32352).

The appellate court found this not just wrong, but clearly erroneous. See *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir.1988) ("To be clearly erroneous, a decision must strike us as more than just maybe or probably

wrong; it must...strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.") cf. *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1271 (9th Cir.2003) (affirming district court's findings of fact in favor of Appellant Sushi Deli, because substantial evidence supported conclusion). Notably, the reviewing court's instruction that this Court "calculate what the government eventually paid *each year* ..., what it should have paid *each year* based on what the government received, then take the difference between the two," 782 F.3d at 730 (quoting 626 F.3d at 322), came with regard to False Claims Act. Still, casting the instruction aside now that we are in the land of equitable remedies would test the appellate court's taste for lutefisk.[2]

At the same time, another point bears emphasis: United Technologies' off-sets stem from eliminating contractual provisions that would have increased engine prices when the government awarded more engines to Pratt. They are off-sets for waiving contractual provisions designed to cover the costs entailed with selling more than a limited percent of engines in foreign military sales, off-sets for agreeing to waive a provision that increased the price for increasing the awarded number of engines by more than a certain percent, again presumably covering costs that arise from changes in production encountered by Pratt, a company that had produced 100% of the predecessor engine. These savings are being recognized in a case where the start-up costs of production for the other producer, General Electric, one that had never produced this engine, were

discounted as negligible, rendering their engines suitable for comparable market value comparison. 782 F.3d at 735. One might imagine that what is sauce for the goose is sauce for the gander.

Be that as it may, in the opening year of this multi-year contract, the rival companies made proposed contract offers to the Air Force for their jet engines. United Technologies would have the Court conclude that the Air Force never paid their offered prices, because of three engine price reductions in the two years after the 1983 BAFO. And indeed, in a nutshell, "the government ultimately never paid *any* of them." 782 F.3d at 732 (emphasis in original); see also PageID# 36822.

The Court takes guidance from Restatement (Third) of Restitution and Unjust Enrichment, particularly from Chapter 7, Remedies, Topic 1, Restitution via Money Judgment: the Measure of Unjust Enrichment, which lays out a method for determining disgorgement amounts.

(4) Unless the rule of subsection (2) imposes a greater liability, the unjust enrichment of a conscious wrongdoer, or of a defaulting fiduciary without regard to notice or fault, is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty. Restitution remedies that pursue this object are often called "disgorgement" or "accounting."

*Restatement (Third) of Restitution and Unjust Enrichment* § 51 (2011).

---

**2.** As humorist Garrison Keillor describes it, "Lutefisk is cod that has been dried in a lye solution. It looks like the desiccated cadavers of squirrels run over by trucks, but after it is soaked and reconstituted and the lye is washed out and it's cooked, it looks more fish-related, though with lutefisk, the window of success is small. It can be tasty, but the statistics aren't on your side. It is the hereditary delicacy of Swedes and Norwegians who serve it around the holidays, in memory of their ancestors, who ate it because they were poor. Most lutefisk is not edible by normal people." Garrison Keillor, *Pontoon: A Novel of Lake Wobegon*, at 183 (2013)

Subsection 2 concerns itself with market value, which, as stated above, is only relevant if it would impose greater liability:

(2) The value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value. Market value may be identified, where appropriate, with the reasonable cost of a license.

*Id.* Market value does not act as a limitation on damages because the focus in disgorgement is on the amount wrongfully obtained. This implicitly forecloses United Technologies' plea invoking Ohio and Colorado law that the Court require the government to prove substantial detriment. See Doc. 465 at 11-12, PageID# 39016-17 (citing, *inter alia, Gaier v. Midwestern Group,* .76 Ohio App.3d 334, 601 N.E.2d 624, 627 (1991); and *Van Zanen v. Qwest Wireless, LLC,* 522 F.3d 1127, 1130 (10th Cir.2008)).

■ The amount of money subject to disgorgement in a given case is measured by "the entire amount of profits which were illicitly *received*" as a result of the defendant's wrongdoing. *S.E.C. v. Great Lakes Equities Co.,* 775 F.Supp. 211, 214 (E.D.Mich.1991)(emphasis added)(citations omitted). Receipt would be necessary "to ensure that the award could properly be considered a disgorgement of money received by the defendant[ ], and could be characterized as equitable . . . (and permissible without a jury trial consistent with the Seventh Amendment), as opposed to compensation to the victims in the amount of their loss (which would be characterized as damages and therefore as legal, rather than equitable, restitution). Tracing, in the sense required for such remedies as constructive trust, [however, is] not required." *F.T.C. v. Bronson Partners, LLC,* 654 F.3d 359, 374 (2d Cir.2011). Thus, the Court cannot agree with the government that, because the burden of proof of offsets

should be placed on the wrongdoer, this Court should hold that United Technologies has failed to prove .any offset at all related to the warranties in year one. The first question is how much money United Technologies received.

■ The Court will thus determine the reduced amounts United Technologies wrongfully received in FEC I. Under the FEC I terms, United Technologies would have received $2,887,710 per engine during FEC I. For the 90 Pratt engines purchased by the Air Force in FEC I, the original contract price was reduced to $2,710,033, for a total savings of $15,990,930. For 64.445 Foreign Military Sales engines (69.445 Foreign Military Sales less five free engines to Korea), the reduction from the . original price to $2,785,372 yielded an additional FEC I discount of approximately. $6,595,172. See DX 303, p. 001515 (final FEC I engine prices and quantities). For FEC I, the government is thus entitled to disgorgement not of $23,762,721 plus interest, but of $1,176,619 plus interest.

Finally, in case a reviewing court should find fault with this opinion, the Court will restate its position on United Technologies' defenses under Ohio law and against the imposition of interest. In 2001, when this case was assigned to a different judge, United Technologies argued that under Ohio law, a plaintiff may not pursue both claims in contract and equitable remedies in the same action. Doc. 61 at 7, Doc. 88 at 2-3. In 2003 one of this judge's first orders in the case decided:

However, the instant case is governed by federal common law. See *Boyle v. United Technologies Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); see also Noel Keyes, Government Contracts Under the Federal Acquisition Regulation § 33.22. (2d . ed.1996) ("government contracts . . . , with few ex-

ceptions, ... are governed by federal law regardless of the place of execution or the place of performance."). .

Doc. 152, *United States v. United Techs. Corp.*, 255 F.Supp.2d 779, 785 (S.D.Ohio 2003). Thus, federal law applies, foreclosing United Technologies' defenses under Ohio law.

As regards the imposition of interest, the Court has previously ruled:

> In the Sixth Circuit, the rate of prejudgment interest is left to the sound discretion of the trial court, *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir.1998), but should be neither punitive nor so low that it "fails to make the plaintiff whole by inadequately compensating him or her for the lost use of money." *Id.* at 618. United Technologies opposes the imposition of prejudgment interest, asserting that it is inapplicable to contract debts. United Technologies' position ignores that these debts were not contractual, but rather the result of unjust enrichment and payment by mistake.

950 F.Supp.2d at 956.

 The government has previously requested that the Court calculate prejudgment interest according to the Current Value of Funds Rate published by the Treasury. See http://www.fms.treas.gov/cvfr/index.html. The Current Value of Funds Rate is the interest rate federal agencies must charge on debts and is established at the outset and is not subject to change during the life of the debt. 31 C.F.R. § 901.9(b)(3). Using the Current Value of Funds Rate has been held to be an appropriate prejudgment interest rate on government common law claims for payment by mistake and unjust enrich-

ment. *United States ex rel. Zissler v. Regents of Univ. of Minnesota*, 1998 WL 2026226 at *5–7 (D.Minn. June 1, 1998). United Technologies, while opposing the imposition of prejudgment interest, has not opposed this manner of computing the interest.

Prejudgment interest for FEC I will run from the date representing the median date of payment for all invoices that are subject to the government's common law claims within FEC I.

### III. Conclusion

 Thus, United Technologies Corporation's Motion for Entry of Final Judgment, Doc. 457, is **GRANTED-IN-PART** and Plaintiff United States' Cross–Motion for Entry of Final Judgment, Doc. 464, is **GRANTED-IN-PART**, the government is awarded statutory penalties of $7,090,000 and disgorgement of $1,176,619 plus interest.[3]

The government is **ORDERED** to propose via CM/ECF a judgment entry effectuating this ruling, to include interest, by June 17, 2016.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, June 3, 2016.

---

**3.** Because a penalty is not remedial in nature, award of a penalty does not foreclose disgorgement. See, e.g., *Jones v. Fenton Ford,* *Inc.*, 427 F.Supp. 1328, 1338 (D.Conn.1977) and *Ash Sheep Co. v. United States*, 252 U.S. 159, 170, 40 S.Ct. 241, 64 L.Ed. 507 (1920).